UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HUBERT A. HENDRICKS, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-0376-DFH-TAB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Hubert Hendricks seeks judicial review of a decision by the Commissioner of Social Security denying his claim for disability insurance benefits under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge ("ALJ") determined that Mr. Hendricks was not disabled because he could still perform his past relevant work. Mr. Hendricks sets forth a number of arguments for why remand is appropriate. The most cogent is that the ALJ failed to properly address Listing 12.05 for mental retardation. The ALJ's ultimate conclusion may be correct, but his reasons for rejecting Mr. Hendricks' claim under Listing 12.05 are both factually and legally incorrect. Since this court must base its review on the reasoning given by the ALJ, remand is necessary.

*Background*

Mr. Hendricks has suffered a great deal of pain for the past ten years.  He has had trouble with his back, his neck, his left arm, both hands, and his feet.  Mr. Hendricks was born in 1968.  He completed his education through ninth grade, generally in special education classes starting in the sixth grade.  R. 517.  He has been employed as a spray machine and heavy equipment operator.  R. 282, 929-30.  He quit his job at the end of 2000 because of his health problems.  A previous request for Social Security benefits filed on January 8, 2001 was denied by a different ALJ on January 24, 2003.  R. 49-58.  The pending disability benefits  application was filed on May 22, 2003.

Since the 2003 denial of benefits, Mr. Hendricks has undergone four significant changes in his conditions.   First, he underwent mental health screening as a result of his depression and was given a formal IQ test.  Second, he had surgery on his back to repair structural problems.  Third, his treatment for recurrent pain has gone from prescription medication to increasingly advanced pain-treatment therapies.   Fourth, he had surgery on his hand to deal with lingering problems with "trigger fingers."   For the purposes of this entry, the mental defects are most relevant, and the other medical history will not be discussed in detail.

After the 2003 denial of benefits, Mr. Hendricks began seeing counselors to deal with his depression.  He saw Dr. Ann Leach for psychiatric help, and she prescribed Prozac.  He was referred by his counselor to a clinical psychologist for an IQ test.  Betty Watson administered the Wechsler Adult Intelligence Scale-III IQ test.  Mr. Hendricks received a Verbal IQ score of 68, a Performance score of 79, and a Full Scale IQ score of 71.  The Verbal IQ score is "within the extremely low range at the 2nd percentile."  R. 519.

As a result of these mental issues, Dr. Nanci Nilles did a mental residual functional capacity assessment based on a file review.  She found that Mr. Hendricks could perform very few tasks associated with work.  She found, for instance, that Mr. Hendricks did not have the "ability to understand and remember detailed instructions" or to "sustain an ordinary routine without special supervision."  R. 737-38.

Mr. Hendricks has dealt with severe back pain and received treatment from Dr. Haddad of the Neurosurgical Clinic in Bloomington, Indiana.  Dr. Haddad performed a C5-6 and C6-7 cervical diskectomy and fusion on June 8, 2004.  R. 623.  Dr. Haddad continued to see Mr. Hendricks after the surgery but discharged him on August 11, 2004, stating that Mr. Hendricks "has done remarkably good" and noting only intermittent neck pain and stiffness.  R. 617.  Mr. Hendricks returned complaining of back pain on July 13, 2005 and had an MRI.  The MRI

noted some problems but "failed to reveal any significant operative pathology."  R. 613-15.  Dr. Haddad referred Mr. Hendricks for more pain management.

Pain management is probably Mr. Hendricks' most serious problem.  He saw Dr. Tiwari, a pain management specialist, for back and neck pain.  He underwent a series of shots for pain relief, which often would help for a week or two before symptoms returned.  By August 3, 2005, Mr. Hendricks had received "cervical medical branch injections, cervical radiofrequency ablation, and transforaminal injections." R. 642.  At that point, doctors recommended a spinal cord stimulator.  Mr. Hendricks returned to Dr. Haddad on November 16, 2005 who recommended an intrathecal opioid pump, which is a device that is implanted into the spinal chord and delivers concentrated amounts of pain medication.  At the hearing, Mr. Hendricks testified that the pump had been inserted and was having only limited impact, reducing his pain on a one to ten scale from ten to nine.  R. 936.

Mr. Hendricks' hand problems were treated by Dr. Dellacqua of the Bloomington Bone & Joint Clinic.  Mr. Hendricks' hand problems are longstanding and include a right hand that will not supinate, meaning he cannot turn his palm up towards the ceiling.  He had surgery for a left ulnar nerve transposition on February 11, 2003.  R. 824.  On July 19, 2005, he had surgery done for trigger fingers on his left hand.  This surgery followed years of more conservative treatment for pain in his left hand and arm.  On August 1, 2005, Dr. Dellacqua cleared Mr. Hendricks to return to work without restrictions.  On October 3, 2005,

Mr. Hendricks reported pain in his left palm and was started on a therapy program.  R. 790.

At the hearing before the ALJ, four people testified:  Mr. Hendricks, mental health medical examiner David Jarmon, orthopedic surgeon Dr. Richard Hutson, and rehabilitation counselor Gail Corn.

Jarmon testified first about Mr. Hendricks' depression.  He commented on the low IQ scores and opined that the fact that Mr. Hendricks had worked for a number of years "probably would" cast doubt on application of the mental retardation listing.  R. 908.  Jarmon seemed uncertain about what foundation Dr. Nilles had for her findings but stated that if they were true, Mr. Hendricks "wouldn't be capable of functioning."  R. 911.

Dr. Hutson testified as to Mr. Hendricks' physical health history and specifically noted that the doctors' restrictions on him were equivalent to light work.  R. 922.  He also stated that nothing in the record met a listing level impairment.  R. 923.  Dr. Hutson acknowledged that a pain pump would be inserted only in a relatively severe case.  R. 927.

Corn testified that Mr. Hendricks' past work experience was as a heavy equipment operator, laboring work, and some spraying machine operations.  R. 929-30.  The ALJ's hypothetical question to Corn asked whether someone who

was limited to simple repetitive work of a light nature and with Mr. Hendricks'
right hand supination issue could be a spraying machine operator.  Corn testified
that the hypothetical person could perform that work.

Mr. Hendricks testified about his medical history, consistent with his
medical records.  He testified that he did not leave the house "all the time," having
ventured out only once in the seven days before the hearing to see a doctor.  R.
940.  He did not pay the bills or do house work.  He stated that he had trouble
eating because of reflux, but he had gained ninety pounds.  He said the weight
gain was a result of side effects from his numerous medications.  The other side
effect was drowsiness.  R. 946.

*The Statutory Framework for Determining Disability*

To be eligible for the disability insurance benefits he seeks, Mr. Hendricks
must establish that he suffered from a disability within the meaning of the Social
Security Act.  To prove disability under the Act, the claimant must show that he
is unable to engage in any substantial gainful activity by reason of a medically
determinable physical or mental impairment that could be expected to result in
death or that has lasted or could be expected to last for a continuous period of not
less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Mr. Hendricks was disabled
only if his impairments were of such severity that he was unable to perform work
that he had previously done and if, based on his age, education, and work

experience, he also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him in his immediate area, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Mr. Hendricks was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520.  The steps are as follows:

(1)   Has the claimant engaged in substantial gainful activity?  If so, the claimant was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, the claimant was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)   If not, could the claimant do his past relevant work?  If so, the claimant was not disabled.

(5)      If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then the claimant was not disabled.  If not, the claimant was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

## Standard of Review

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.   42 U.S.C. § 405(g).   Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by weighing the evidence, resolving material conflicts, or reconsidering

the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

The Commissioner must consider all relevant evidence and "may not select only that evidence that favors the ultimate conclusion."  *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997).  In reaching a decision, the ALJ "must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning."  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), citing *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson*, 131 F.3d at 1234, or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*Discussion*

Mr. Hendricks has set forth four reasons he feels the case should be remanded.  First, he argues that the ALJ did not properly address Listings 1.02, 1.04, and 14.09.  Second, he argues that the ALJ ignored the side effects that his pain medication would have in a work setting.   Third, the decision failed to consider his diagnosis of fibromyalgia.  Finally, he argues that the ALJ erred in

not finding that his low IQ means he met Listing 12.05.  Mr. Hendricks has agreed

that the relevant time frame for analysis was from his previous denial of benefits,

January 25, 2003, through his date last insured, September 30, 2005.

*Listing 12.05*

The primary problem with the ALJ's decision is his treatment of Listing

12.05 for mental retardation.  Mr. Hendricks' claim under that listing is based

primarily on his IQ verbal score of 68.  R. 519.  The ALJ rejected application of the

Listing on two grounds.  First, he found that there was no evidence the mental

retardation manifested during the development (childhood) years, and second,

"there is no evidence at all of deficits in adaptive functioning."  R. 31.  The record

shows the ALJ was incorrect on both counts.  Since this court is not allowed to

engage in its own weighing of the evidence, remand is necessary.

Listing 12.05 lays out the standard for demonstrating a disability based on

mental retardation:

> Mental retardation refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during
> the developmental period; i.e., the evidence demonstrates or supports onset
> of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements
> in A, B, C, or D are satisfied.
>
> A.      Mental incapacity evidenced by dependence upon others for personal
>          needs (e.g., toileting, eating, dressing, or bathing) and inability to

follow directions, such that the use of standardized measures of intellectual functioning is precluded; or

B.    A valid verbal, performance, or full scale IQ of 59 or less; or

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D.    A valid verbal, performance, or full scale IQ score of 60 through 70, resulting in at least two of the following:

1.    Marked restrictions of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05.

The requirement of early manifestation, as that requirement has been interpreted, was met by Mr. Hendricks.  He showed that he had left school after ninth grade and had been in special education classes while he was in school. Even without that evidence, the Listing's requirement that "the evidence demonstrates or supports onset of the impairment before age 22," does not require affirmative proof.  Mr. Hendricks relies on *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001), for the proposition that a claimant "need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two when she had offered evidence of low IQ test results after the age of twenty-two."   The Eleventh Circuit relied in part on a statement by the Commissioner in the Federal Register about the word "manifested."  "We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of

current functioning demonstrate that the impairment existed before the end of the development period." *Id*. at 1269, citing 65 Fed. Reg. 50746, 50772 (August 21, 2000).

The parties point to no cases where the Seventh Circuit has weighed in on this exact issue, but in *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986), the court made a similar assumption.  There the issue was whether an IQ test taken after the date last insured showed a mental impairment at the earlier time when the claimant had been insured.  The court determined that "in the absence of evidence leading to a contrary result 'we must and do assume' that an IQ test taken after the insured period correctly reflects the person's IQ during the insured period." *Id.*, quoting  *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985). See also *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) ("a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning"), quoting *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *King v. Barnhart*, 2007 WL 968746, at *3 (S.D. Ind. February 26, 2007) ("A person's IQ is ordinarily presumed to remain stable over time in the absence of any evidence of a change in his or her intellectual functioning.").

The baseline assumption appears to be that a serious mental impairment experienced later in life was also present earlier in life.  Since Hendricks' school history was the only evidence offered on the issue, the only proper conclusion is

that the evidence supports onset of the impairment before age twenty-two.  Mr. Hendricks presents a situation similar to that in *Maresh*, where the case was not merely remanded but reversed.  There the claimant took special education classes and dropped out after ninth grade.  Maresh did not take an IQ test until he was thirty-seven years old.  *Maresh*, 438 F.3d at 900-01.

Additionally, the ALJ was incorrect when he wrote that the record contained "no evidence" of deficits in adaptive functioning.  The record includes Dr. Nilles' Mental Residual Functional Capacity Assessment completed August 25, 2005.  Dr. Nilles was extremely pessimistic about Mr. Hendricks' ability to interact with other people.  She marked that he "cannot perform" such tasks as "The ability to accept instructions and respond appropriately to criticism from supervisors" and "The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  R. 737-38.  The report is just a few pages in a lengthy record, but Mr. Hendricks' attorney specifically highlighted it at the hearing before the ALJ.  R. 911-12.  Admittedly, Dr. Jarmon thought that "it would probably be more likely" that if Dr. Nilles' report was true, then Mr. Hendricks would be found disabled because he could not work, not because of a listing.  R. 913.

Presumably, Dr. Jarmon believed that Mr. Hendricks did not have "deficits in adaptive functioning" because he had held a regular job in the past.  That term "denotes inability to cope with the challenges of ordinary everyday life."  *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007).  Dr. Nilles' report focused on job

performance but certainly hinted at an inability to cope with the challenges of everyday life.  The ALJ addressed the Nilles report at Step IV of his analysis.  He gave "no weight" to the report for purposes of assessing functional limitations as a result of mental impairments because Dr. Nilles considered Mr. Hendricks' pain.  R. 35.  It is unclear why "no weight" was given, since an ALJ should consider the cumulative effects of multiple impairments.  The report is supposed to determine functional limitations as a result of mental, not physical, impairments.  That the report may have considered physical pain means that Dr. Nilles arguably exceeded the scope of the report.  At the same time, it does not inevitably lead to a determination that the report should be given "no weight."[1]

Even without the Dr. Nilles report, the record is rife with examples of how Mr. Hendricks is unable to cope with the challenges of everyday life.  The Listing requirement is not *no* adaptive functioning but *deficits* in adaptive functioning.  He did not leave his house and relied on his wife for a number of daily tasks.  R. 940.  He reported that "he pretty much stays to himself and often is in his room listening to the radio or watching TV."  R. 518.  These problems may be traced to

---

[1]In addition, it is unclear why the ALJ was so certain that Dr. Nilles' conclusions considered the impact of pain.  The Nilles report is extremely sparse.  R. 737-39.  The only mention of pain is a handwritten note explaining a finding of "can perform" for the activity of "ability to interact appropriately with the general public."  The note stated:  "this varies day to day according to psychological symptoms (auditory hallucinations) + pain level." R. 738. While Dr. Nilles does note the pain, she marked "can perform" for the relevant activity meaning she did not make a formal reduction for the pain problems.  This activity was one of the five Dr. Nilles found Mr. Hendricks could perform.  She found he "cannot perform" fourteen activities.

his depression, for which he did not seek treatment until after age twenty-two, but they also show an inability to engage with the world and should have been addressed.  This evidence, if fully considered, may not be enough to satisfy Listing 12.05.  Still, an ALJ must "sufficiently articulate his assessment of the evidence to assure us that he considered the important evidence." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999), quoting *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (internal quotations omitted).  Here, the ALJ did not provide any reasoning on the issue because of an incorrect determination that no evidence was relevant.  Without an explanation of why this evidence was discarded with regard to Listing 12.05, this court cannot affirm the ALJ's decision.

The errors in the ALJ's reasons for rejecting Mr. Hendricks' claim were not harmless.  There is sufficient evidence in the record to support a finding that he could satisfy Listing 12.05.  Listing 12.05 requires that the claimant make two showings, that he "satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).   The introductory paragraph defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . ." *Id.* at § 12.05.  This definition includes not only a low IQ score but deficits in adaptive functioning.  As shown above, Mr. Hendricks has a low IQ score, and the report from Dr. Nilles is evidence of a lack of adaptive functioning.

An ALJ could find based on this evidence that Mr. Hendricks satisfied the opening paragraph.[2]

The second part of Listing 12.05 can be satisfied with one of four possible secondary conditions.  Since Mr. Hendricks is relying on a verbal IQ score of 68, he is limited to 12.05(c) and 12.05(d).  Mr. Hendricks argues that he met 12.05(c), which requires that in addition to the low IQ score, the claimant has "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  The ALJ found Mr. Hendricks had severe impairments of borderline intellectual functioning; lumbar spine disease; rheumatoid arthritis; and right upper extremity dysfunction.  R. 29.  The ALJ determined that Mr. Hendricks had limitations on his ability to work, allowing him to carry only 20 pounds occasionally and requiring him to avoid ladders, scaffolds, or ropes.  The ALJ found that Mr. Hendricks could not supinate his right hand and was "limited to simple, repetitive work, which does not involve a great deal of reading or writing."  R. 32.  The ALJ did not reach the subparts of Listing 12.05 because of his erroneous findings on the opening paragraph.  His findings on severe impairments, however, appear to satisfy 12.05(c), so absent a proper evaluation

---

[2]The Commissioner in his brief makes frequent reference to the fact that Mr. Hendricks was never diagnosed with "mental retardation."  No such diagnosis is necessary.  *Maresh*, 438 F.3d at 899 ("However, this court disagrees with the Commissioner that the Listing's introductory paragraph requires a formal diagnosis of mental retardation.  The plain language of the Listing does not so state, and the Commissioner cites no supporting authority."); *King v. Barnhart*, 2007 WL 968746, at *4 (rejecting argument that a health professional needs to diagnose the claimant with mental retardation).

of the predicate opening paragraph, this court has no choice but to remand the case.

The hearing transcript hints at what motivated the ALJ's decision.  At the hearing, the ALJ pressed Dr. Jarmon on whether he thought Mr. Hendricks met the 12.05 Listing.  The ALJ focused on the fact that Mr. Hendricks had held gainful employment in the past, asking "if the individual had worked before for an extended period of time, will that not cast doubt on the 12.05 diagnosis?"  R. 908.  Dr. Jarmon responded that the 12.05 Listing "would probably be less relevant with an individual who was productive and had a long work day."  *Id.*

Intuitively, Mr. Hendricks' claim that he cannot work because of mental retardation, which requires onset before age twenty-two, is undermined by the fact he held regular work since that age.  On its own, however, the mere fact that someone worked after age twenty-two does not preclude the possibility that Listing 12.05 can be met.[3]  The listing specifically requires a secondary showing of some problem beyond the low IQ that makes work not feasible.  "The reason is that persons with an IQ score in the 60s (or even lower) may still be able to hold a full-time job."  *Novy*, 497 F.3d at 710, citing *Mendez v. Barnhart*, 439 F.3d 360, 361

---

[3]In fact, work history could be irrelevant with a sufficient showing of early manifestation.  "The ALJ's reference to [claimant's] work *subsequent* to age 22 is also confusing, given the Listing's focus on deficits in adaptive functioning manifesting *prior* to age 22. Finally, if a claimant meets a Listing, the ALJ's inquiry must stop, and no further evaluation of the claimant's ability to work is needed."  *Durden v. Astrue*, 586 F. Supp. 2d 828, 838 (S.D. Tex. 2008) (emphasis in original).

(7th Cir. 2006).   When these mental impairments are combined with Mr. Hendricks' physical problems, however, it is possible that he has become unable to work.  For instance, "an individual with Mild Mental Retardation may manage to hold an unskilled job despite her intellectual limitations, but when faced with an additional physical impairment, be unable to work, as recognized by Listing 12.05(c)." *Durden v. Astrue*, 586 F. Supp. 2d 828, 838 (S.D. Tex. 2008); see also *King v. Barnhart*, 2007 WL 968746 at *6 (acknowledging that claimant had held jobs earlier in his life but finding that "the combination of physical impairments with his intellectual limitations is sufficient to satisfy the severity criteria of Listing 12.05C.").

More important, the Commissioner's numerous explanations for the ALJ's unsupported conclusions, while plausible, cannot be entertained by this court under the *Chenery* principle.  As applied to Social Security cases, the *Chenery* principle requires "the ALJ to rationally articulate the grounds for her decision and [the courts] confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), citing *SEC v. Chenery Corp.*, 318 US 80, 93-95 (1943).  Here, the ALJ's discussion of Listing 12.05 was limited to the dual findings that the condition did not manifest itself before Mr. Hendricks was twenty-two years old and that no evidence of deficits in adaptive functioning was presented.  Since both of these statements are incorrect, and the record contains sufficient evidence to support a finding that Mr. Hendricks met  Listing 12.05, the ALJ committed an error necessitating remand.

*Remaining Arguments*

Remand is required based solely on the Listing 12.05 analysis.  The other issues argued by Mr. Hendricks would not support remand.  First, the ALJ need not hypothesize about every possible listing that Mr. Hendricks may satisfy, particularly in this case where Mr. Hendricks was represented by counsel at the hearing.  "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."  *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).  Counsel did not present any evidence directly tailored to any of the listings that the ALJ allegedly ignored, even after Dr. Hutson, the orthopedist, testified that nothing indicated a listing level impairment.  The only listings mentioned at the hearing were 12.04 and 12.05.  In *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), the Seventh Circuit upheld a decision that did not specifically note the listings considered.  There, "the ALJ did not reject specific evidence supporting [claimant's] position that her impairments meet or equal a listing impairment in favor of the contrary opinions of the Secretary's consulting physicians."  *Id.*

Furthermore, on some of the listings, the ALJ clearly articulated his position in his step four analysis, and that defensible position on the evidence would not have satisfied the listing in question.  For instance, Listing 1.02 is "characterized by gross anatomical deformity," and nothing in Mr. Hendricks' file since his

previous denial of benefits would meet this standard.[4]  Listing 1.04 requires much more serious spinal injuries than Hendricks has, particularly as documented by the ALJ in his decision.  R. 33-34 (analyzing Mr. Hendricks' medical history of structural back problems).  Finally, Hendricks clearly did not meet the standards for Listing 14.09, inflammatory arthritis.

The ALJ's failure to address fibromyalgia is similarly not grounds for remand.  A diagnosis of fibromyalgia is not necessarily disabling.  *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not") (internal citations omitted).  Fibromyalgia can be disabling based on unbearable pain, and in this case, the ALJ amply considered Mr. Hendricks' pain.  After all, pain was the primary complaint and issue of the hearing.  The ALJ acknowledged that Mr. Hendricks "had been diagnosed with various conditions including rheumatoid arthritis and polyarthralgias." R. 33.  Additionally, with respect to his pain treatment:  "Various diagnoses have been attached to the claimant, including myofascial pain syndrome."  *Id.*  That the ALJ referred to these conditions instead of specifically fibromyalgia does not change the quality of the analysis on whether the pain was disabling.

---

[4]Before Mr. Hendricks' previous determination of benefits, a private disability representative wrote a letter stating that she believed Mr. Hendricks met Listing 1.02.  R. 521-23.  The ALJ disagreed, and the more recent medical records do not show a substantial change that would warrant a different finding.

Finally, the failure to consider the medicinal side effects is not grounds for reversal.  Again, this argument was not fully developed before the ALJ, and the ALJ noted that Mr. Hendricks suffered side effects, including weight gain and drowsiness.  R. 32.  Those were the only side effects that Mr. Hendricks testified about at the hearing.  R. 946.  The medical records do not point out anything more disabling than these problems.  No claim was made on behalf of Mr. Hendricks' weight, and he never hinted that his drowsiness was disabling or anything akin to narcolepsy.  The possible side effects are consistent with the ALJ's findings on Mr. Hendricks' capabilities.

*Conclusion*

For the foregoing reasons, this case is remanded for a further explanation of whether Mr. Hendricks satisfied Listing 12.05 for mental retardation, and any other action necessary to issue a decision consistent with this entry.


So ordered.

Date: March 11, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana


Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Charles D. Hankey
charleshankey@hankeylawoffice.com